In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-2793

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTONIO OWENS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 1138-4—**Ronald A. Guzman**, *Judge.*

ARGUED APRIL 12, 2005—DECIDED SEPTEMBER 21, 2005

Before MANION, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Defendant Antonio Owens appeals his conviction and sentence for bank robbery in violation of 18 U.S.C. § 2113(a) and 2, arguing that the district court abused its discretion by admitting evidence which suggested that Owens had robbed the same bank seven and a half years earlier. Because this prior bad act evidence is neither admissible pursuant to Federal Rule of Evidence 404(b) nor intricately related to the charged crime, we vacate the defendant's conviction and remand his case for a new trial.

## I.  BACKGROUND

On November 22, 2002, Princeten Davis was apprehended by police while fleeing the scene of a bank robbery. Once under arrest, Davis, after changing his story several times, eventually admitted to the robbery. He also confessed to his involvement in another bank robbery committed weeks before, on October 19, 2002. He insisted, however, that this earlier robbery was the idea of his cousin—defendant Antonio Owens—and that Owens made him do it. Owens was arrested on September 4, 2003, and brought to trial before a jury in March 2004 for bank robbery in violation of 18 U.S.C. §§ 2113(a) and 2.

At trial, Davis testified against Owens in exchange for a reduced prison sentence for his involvement in both the October and November 2002 robberies. Davis testified to the following: sometime before October 19, 2002, Owens hatched a plan to rob a bank with Davis. On the morning of October 19, 2002, after the pair spent the night at Davis's mother's home, Owens woke Davis up and asked him if he was ready to rob a bank. After Davis affirmatively responded, Owens drove Davis to a Banco Popular branch in Melrose Park, Illinois. When they arrived, Owens wrote a note, which he gave to Davis with instructions to hand it to a bank teller once inside. The note stated, "I have a gun. Please don't make me kill you. Put all the money on the counter. No one will get hurt." Owens then gave Davis a walkie talkie, keeping one for himself, and said he would warn Davis should the police arrive. Though Davis went so far as to enter the bank and to get in line to see a teller, he grew scared, feeling out of place as the only African American person in the room, and left.

Davis further testified that once he returned to the car, Owens told him that he would drive him to another bank where he would feel more comfortable. According to Davis, Owens then proceeded to drive him to a Harris Bank

branch located on North Avenue on the west side of Chicago. Owens suggested that his cousin would feel more comfortable at this bank because it serviced more African American patrons than their prior target, and because Owens had robbed that bank before. So comforted, Davis got out of the car and entered the bank with the handwritten note and walkie talkie. He handed a teller the note; she handed him money that she had been counting. Cash in hand, Davis left the bank, rushed to meet Owens in the alley behind the bank, and got in the car which Owens drove back to the home of Davis's mother. In his haste, Davis left the note behind on the teller's counter.

Several of the government's witnesses—namely, Davis's mother (Nadine) and cousin (Cortez)—testified that Owens had admitted to each of them separately that he and Davis had robbed the bank. Diamond Magnum, one of Davis's friends, testified that Owens spent his portion of the robbery proceeds on her, and that he admitted to robbing banks in the past.

Forensic evidence revealed that the demand note contained one fingerprint belonging to Owens. In addition, a handwriting expert testified that a comparison of a handwriting sample from Owens and the demand note revealed that Owens wrote the note. The district court, at the government's request, admitted evidence tending to suggest that Owens had robbed the same Harris Bank with the aid of a demand note in 1995. Though Owens was never charged with that prior robbery, the teller who received the demand note—Myrna Castillo—identified Owens as the robber in a lineup she viewed in 1995. She also identified Owens at trial through government exhibit 6—a photograph of the lineup she had attended in 1995. This photo shows Owens and five other men seated, barefoot, and wearing large signs with numbers around their necks and what appears to be identical prison jumpsuits.

In his defense, Owens presented an alibi witness—Owens's former neighbor, Brian Wrobel. Wrobel testified that Owens was cleaning one of his cars at the time of the 2002 robbery, and could not have been involved in the crime. As for the demand note with his fingerprints and handwriting, Owens claims that Davis took the note paper from him, and that he had no knowledge that his paper would be used to commit a crime.

The jury found Owens guilty. The district court thereafter sentenced him to 145 months in prison, and Owens now appeals his conviction and sentence.

## II.  ANALYSIS

The crux of Owens's appeal centers around the admission of past bad act evidence—that evidence tending to suggest that he had committed a prior, uncharged bank robbery at the same Harris Bank branch in 1995. This evidence was introduced through the testimony of Davis, Castillo (the teller who received the demand note during that prior robbery), and Sergeant Robert Fitzgerald (the police officer who organized the lineup at which Castillo identified Owens as the 1995 robber).

### A.  Standard of Review

We review a district court's evidentiary decisions for an abuse of discretion. *United States v. Rangel*, 350 F.3d 648, 650-51 (7th Cir. 2003). Furthermore, when reviewing evidentiary errors, we will only reverse and order a new trial provided that the improper admission was not harmless, which is to say "only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice." *United States v. Hernandez*, 330 F.3d 964, 969 (7th Cir. 2003).

### B. Admission of Evidence of Prior Uncharged Bank Robbery Was Improper

Prior bad act evidence may be admitted either pursuant to Federal Rule of Evidence 404(b), *see United States v. Wilson*, 31 F.3d 510, 514-15 (7th Cir. 1994), or where it is intricately related to the current charged crime or necessary to complete the story of the crime on trial, *see United States v. Ramirez*, 45 F.3d 1096, 1102 (7th Cir. 1995); *United States v. Hargrove*, 929 F.2d 316, 320 (7th Cir. 1991). Here, the district court found the evidence suggesting Owens's involvement in the 1995 Harris Bank robbery admissible under both standards. However, Owens argues that this past bad act evidence fits neither, and that the admission of such evidence constituted an abuse of discretion.

### 1. Evidence of the Prior Robbery Is Not Admissible Under Federal Rule of Evidence 404(b)

Under Federal Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." However, before admitting evidence under Rule 404(b),

> the court must determine whether (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Wilson*, 31 F.3d at 514-15 (citing cases).

With regard to this first prong, the government argues that the evidence of the 1995 robbery was properly admitted toward establishing three alternative matters in issue other than propensity: (1) defendant's participation in, and control of, the charged offense; (2) the absence of mistake or accident in finding himself involved in the charged offense; and (3) his knowledge of the particular bank that he chose to rob.

We address first the "participation in and control of" argument, in which the government contends that the evidence of the prior robbery was properly admitted to show that Owens was not an "innocent pawn" in the commission of the charged offense. In *United States v. Lightfoot*, 224 F.3d 586, 588 (7th Cir. 2000), we held that evidence of a defendant's past violent abuse of a female roommate was admissible to refute his defense that she was the real drug dealer in the charged offense, and that he was at best an innocent pawn in her nefarious undertakings. *Id.* Citing *Lightfoot*, the government argues that the past act evidence here was properly admitted to rebut Owens's defense that Davis was the real robber who implicated Owens merely to reduce his own sentence; to prove that Owens was not merely a pawn whose note paper was used to create a demand note, but rather the brains behind the operation who picked the bank that Davis ultimately robbed. This dog just doesn't hunt. Owens never claimed that he was a pawn in the robbery; rather, he claims that he was not involved at all. To construct an innocent pawn defense, Owens would first have to concede his presence in the car with Davis on the day of the robbery, consistent with Davis's account, and then insist that he was no more than an unwitting "wheelman." Only then would the evidence of the 1995 robbery be putatively admissible to establish his participation and control of the instant offense. But that is not the defense Owens chose to mount. His is an alibi defense, rendering

the government's participation and control argument a non-starter.

In the alternative, the government argues that the past bad act evidence was properly admitted to prove absence of accident or mistake. Prior bad act evidence may be admitted "as proof of an element of a crime, such as intent, if the act demonstrates how the defendant's behavior was purposeful rather than accidental." *United States v. Brown*, 34 F.3d 569, 573 (7th Cir. 1994); *see also United States v. Best*, 250 F.3d 1084, 1089 (7th Cir. 2001). However, 18 U.S.C. § 2113(a) is a general intent crime, and thus specific intent need not be proven to establish the instant offense. *See Carter v. United States*, 530 U.S. 255, 270 (2000) (holding that 18 U.S.C. § 2113(a) is not a specific intent crime); *United States v. Fazzini*, 871 F.2d 635 (7th Cir. 1989) (rejecting defendant's diminished capacity defense to 18 U.S.C. § 2113 charges because "armed bank robbery is a *general* intent crime . . . and diminished capacity is a defense only to *specific* intent crimes.") (emphasis in original). And where specific intent is not an essential element—as in the case of general intent crimes—evidence of past bad acts shall not be admitted to prove such intent unless the government has reason to believe that the defendant will place it in issue. *United States v. Shackleford*, 738 F.2d 776, 781 (7th Cir. 1984) ("[W]hen intent is only a formal issue, so that proof of the proscribed act gives rise to an inference of intent, then unless the government has reason to believe that the defense will raise intent as an issue, evidence of other acts directed toward this issue should not be used in the government's case-in-chief and should not be admitted until the defendant raises the issue."), *modified on other grounds by Huddleston v. United States*, 485 U.S. 681, 685 (1988). Thus, the absence of accident or mistake is not a matter in issue here unless Owens made it one.

Here, the government argues that Owens did place

accident in issue by arguing that his fingerprint landed on the demand note only by coincidence—that the note paper belonged to the defendant but was taken by Davis for commission of the robbery without his knowledge. Toward that end, the government contends that the evidence of the 1995 robbery, which suggests that Owens robbed the same bank by sliding a similar note to a teller in similar fashion, tends to disprove Owens's claim of accidental association with the note here. We cannot accept this argument. That Owens allegedly committed a robbery at the same bank seven and a half years earlier does absolutely nothing to prove or disprove how Owens's fingerprint ended up on a note used to rob the bank victimized here. This prior bad act that he may or may not have committed does not make him any more or less likely to have intentionally touched and penned the demand note used in the charged offense. If the issue of absence of accident or mistake was placed in issue at all, this evidence of the 1995 robbery has done nothing to address it. Rather, the only value of such evidence is to show the defendant's propensity to commit crime, and that value, if it ever held currency, went bankrupt long ago.

In yet another alternative, the government argues that evidence of the 1995 robbery may be admitted to demonstrate Owens's knowledge of the Harris Bank branch that was robbed, and to explain why he chose to target that branch. It argues Owens's alleged prior robbery demonstrates that he knew the bank well enough to decide that it was a better target for Davis—*i.e.*, proving how he knew that the branch had more African-American customers and that Davis would feel more comfortable there. However, knowledge is not in any way at issue in this case—either as an element of the crime or in rebuttal to a defense. Furthermore, even if knowledge was in issue, the evidence of the 1995 robbery does not demonstrate any *special* knowledge of the bank used to commit the

present crime. While both the 1995 and the 2002 robberies were committed in substantially the same way, in that both involved the use of a demand note, the same may be said of most all bank robberies. Thus, even with an unwarranted assumption of relevance getting it past prong one of our Rule 404(b) inquiry, this evidence could not overcome prong four: its probative value is quite slight, while its danger of inspiring unfair prejudice is great.

As the evidence of the 1995 robbery is not directed toward establishing any matter in issue other than the defendant's propensity to commit the crime charged, it is not admissible under Rule 404(b).

### 2. Evidence of the Prior Robbery Is Not Intricately Related To Charged Offense

As an alternative basis for admission of past bad act evidence, the government argues that the 1995 robbery is "intricately related" to the charged crime. "Evidence of other acts which are 'intricately related to the facts of the case' is admissible without reference to Rule 404(b), provided that it passes the balancing test under Rule 403." *United States v. Hargrove*, 929 F.2d 316, 320 (7th Cir. 1991). Such intricately related evidence includes information necessary to provide the jury with a complete story of the crime on trial, *Ramirez*, 45 F.3d at 1102; *United States v. Roberts*, 933 F.2d 517, 520 (7th Cir. 1991), to avoid a conceptual or chronological void, *United States v. Lahey*, 55 F.3d 1289, 1295-96 (7th Cir. 1995); *United States v. Hattaway*, 740 F.2d 1419, 1424-25 (7th Cir. 1984), or to explain the basis of relevant relationships between co-conspirators, *United States v. Zarnes*, 33 F.3d 1454, 1469 (7th Cir. 1994).

Here, the government contends that the 1995 robbery is inextricably intertwined with Davis's narrative of the

2002 robbery—in particular, the moments leading up to the robbery—and is part and parcel of testimony crucial to establishing that Owens, contrary to his alibi defense, robbed the bank as charged. The government further argues that the evidence lends crucial credibility to Davis—its star witness—by serving as one of several explicit details recalled by Davis from a pre-robbery conversation that Owens, by virtue of his alibi defense, claims never occurred. And finally, the government contends that the evidence of the prior robbery completes the story of the crime on trial by explaining how Owens chose the bank, and how he knew particular facts about the bank that he would use to reassure Davis before the crime.

Each of the government's arguments succeed in highlighting an intricately related element to Davis's story—but that element is not Owens's alleged involvement in the 1995 robbery. Rather, it is his familiarity with the targeted branch, and to a lesser extent the basis for that familiarity, that is inextricably intertwined with the narrative the government wants to tell. Toward that end, all the government needed was testimony from Davis to the effect that Owens had expressed familiarity with the robbed branch based on the (ambiguous) fact that he had been there before. Had the government shown such self-restraint, it would have just as effectively completed its narrative of the crime, provided sufficient detail of the pre-robbery conversation so as to bolster Davis's credibility, and supplied the basis for Owens's alleged decision to target that particular bank. Instead, the government got greedy, invoked the specter of the 1995 robbery, thereby tainting the record, inviting the risk of unfair prejudice, and placing its case in jeopardy. Because it is Owens's familiarity with the bank, and not his alleged involvement in the 1995 robbery, that is intricately related to the charged offense, we find the evidence of the 1995 robbery to be inadmissible under this standard as well. And, devoid of any basis for admitting

this past bad act evidence, we find that the district court abused its discretion in doing so.

### 3. Admission of the Past Bad Act Evidence Was Not Harmless Error

Furthermore, we cannot say that the district court's error in admitting this prior bad act evidence was harmless. "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." *United States v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir. 1998). Without the improperly admitted evidence, the government's case against Owens consisted of physical evidence tying him to the demand note, and a cadre of biased witnesses. While we do not discount the persuasive weight of the physical evidence, the patent bias found in each government witness—save those testifying as to the 1995 robbery—give us great pause. First there is Davis, the government's star witness, who testified against Owens in return for a reduced sentence on two different crimes; and then there are several of Davis's closely related family members and friends. Confronted with this far from disinterested lineup, the average juror would likely look elsewhere for evidence to corroborate their accounts. In such an event, the evidence of Owens's alleged prior bad act may very well have taken on a central role in the jury's deliberations.

Indeed, the very danger of over-reliance on the past bad act evidence was made all the more likely by the district court's failure to issue a limiting instruction regarding the proper use of that evidence. Here, both parties and the court agreed prior to the instruction of the jury that such a limiting instruction should be given. In fact, the government drafted the instruction itself. Yet for some reason, the

court never provided one. This oversight makes the evil spawned by the improper admission of the past bad act evidence all the more glaring.[1]

The egregiousness of the error is exacerbated further by the admission of the 1995 lineup photo as part of the prior bad act evidence. The photo shows Owens and five other men seated, barefoot, and wearing large signs with numbers around their necks and what appears to be identical prison jumpsuits. The picture clearly portrays Owens as a prisoner in police custody. Not only was this highly inflammatory piece of inadmissible prior bad act evidence admitted into evidence, but it also was published to the jury, and even allowed to accompany the jurors into deliberations. In the jury room throughout, while jurors contemplated Owens's fate, the lineup photo festered as a constant reminder that Owens had at least once before been a prisoner, undermining the fairness of the fact-finding process in its potential to taint the jury's judgment.

---

[1] Because we find that the prior bad act evidence should never have been admitted in the first place, we do not reach the issue of whether the district court should have issued a limiting instruction regarding such evidence, save for a few words in passing. True enough, the responsibility for pointing out this omission by the court falls squarely on the shoulders of defense counsel, *see, e.g.*, *United States v. McKinney*, 954 F.2d 471, 479 (7th Cir. 1992) (holding that a defendant who fails to request a limiting instruction at trial cannot complain on appeal that such an instruction was not given), and in that regard, Owens's attorney failed his client. But it is a surprise to find the government, which, as drafter of the omitted limiting instruction, was clearly aware of the past bad act evidence's prejudicial potential, willing to jeopardize its own case by not itself ensuring that such an instruction be given. While we cannot say that the government shares the obligation to point out the oversight, it is fair to posit that its failure to do so now and in the future is done at its own peril.

*See Estelle v. Williams*, 425 U.S. 501, 503-05 (1976) (finding that a "constant reminder of the accused's condition implicit in such distinctive, identifiable attire [prison clothes] may affect a juror's judgment," and thereby unacceptably "undermine the fairness of the fact-finding process").

With such potent, and improper, evidence removed from the jury's consideration, the government's case against Owens—consisting only of Davis, Davis's family and friends, and a sole fingerprint—would be significantly less persuasive in the mind of an average juror. For that reason, we find that the district court's abuse of discretion in admitting that prior bad act evidence was not harmless error.

## III. CONCLUSION

For the foregoing reasons, we VACATE the defendant's conviction and REMAND his case for a new trial.

MANION, *Circuit Judge*, concurring. I concur in the result reached by the court, but on narrower grounds. I too have serious concerns about the lineup photograph introduced into evidence and published to the jury, and I would remand the matter to the district court based exclusively on the prejudicial impact of the photograph.

The government introduced the lineup photograph during testimony about the 1995 robbery. Specifically, a police officer testified that a witness in 1995 identified Owens as the robber using the lineup photograph. However, that witness already testified at trial that she had identified

Owens in 1995. The very limited probative value of this photograph was far outweighed by its prejudicial impact on the jury. The photograph, which the jury possessed while deliberating, showed six black men seated side-by-side holding identification numbers. All were dressed in obvious prison garb, were barefooted, and wore a beret. Owens sat at attention, staring wide-eyed at the camera. The other five were relaxed, looking bored and disinterested. Clearly Owens was the only one in the lineup of prisoners who had any concern with the purpose of the lineup. As the Supreme Court recognized in *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976), "the constant reminder of the accused's condition in such distinctive identifiable attire may affect a juror's judgment." The lineup photograph simply could not satisfy the strictures of Fed.R.Evid. 403, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . ." The prejudice from the lineup photograph was too great.

However, I cannot conclude that the introduction of all evidence of the 1995 robbery constituted an abuse of discretion. While prior bad acts evidence is generally prohibited, it can be introduced when it is intricately related to the charged crime. *See United States v. Hargrove*, 929 F.2d 316, 320 (7th Cir. 1990). To qualify as intricately related, "the question is whether the evidence is properly admitted to provide the jury with a 'complete story of the crime [on] trial,' whether its absence would create a 'chronological or conceptual void' in the story of the crime, or whether it is 'so blended or connected' that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime." *United States v. Ramirez*, 45 F.3d 1096, 1102 (7th Cir. 1995) (internal citations omitted). Of course, even intricately related evidence must still pass muster under Fed. R. Evid. 403.

The evidence of the 1995 robbery is intricately related

to the present crime because it tells the rest of the story. Owens claims he was washing someone's car at the time of the robbery. Thus the robbery was all Princeten Davis's doing. Davis, however, testified that Owens picked a Banco Popular branch as the initial target, but after entering, Davis discovered he was the only black person in the bank. Because he thought he was conspicuous, he lost his nerve and left. So what was it about the Harris Bank that enabled Davis to regain his nerve and complete the robbery? The court suggests that all the government needed was testimony from Davis to the effect that "Owens had expressed familiarity with the robbed branch based on the (ambiguous) fact that he had been there before." But because the government "got greedy [and] invoked the specter of the 1995 robbery," it tainted the record and invited unfair prejudice. But without reference to the robbery, Davis's reason for his change of heart is not complete. To some extent, Owens had some familiarity with the Banco Popular branch. Familiarity wasn't enough. Davis regained his nerve to rob the Harris Bank when Owens observed that the Harris Bank had more black patrons and Owens had previously robbed that bank. In addition to explaining why Davis regained his nerve, it also enhanced his credibility when testifying that Owens was intricately involved in the 2002 Harris robbery. When the government introduced evidence that Owens had in fact previously robbed the Harris Bank branch, it helped authenticate Davis's claim that Owens told him about that robbery.

Further, this evidence satisfies the requirements of Fed. R. Evid. 403. The high probative value of the evidence helps explain why they chose the Harris Bank, how Davis regained his nerve, and whether he was telling the truth. This evidence is not substantially outweighed by a danger of unfair prejudice. *See Hargrove*, 929 F.2d at 320 ("Any prejudice from this testimony resulted solely from its

tendency to link Hargrove to the [crime] and was not unfair.").

   In short, in my view the district court properly decided that the evidence of the 1995 robbery by Owens was necessary to fill a void in the story of what happened in 2002. But I agree with the court that the flagrant lineup photograph magnified Owens' criminal past and his propensity to repeat the crime.

A true Copy:

            Teste:

            _____
            *Clerk of the United States Court of*
            *Appeals for the Seventh Circuit*

USCA-02-C-0072—9-21-05